IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 19, 2017

## STATE OF TENNESSEE v. THOMAS PAUL ODUM

**Appeal from the Criminal Court for McMinn County
No. 14-313   Andrew M. Freiberg, Judge**

_____

**No. E2017-00062-CCA-R3-CD**

_____

Defendant, Thomas Paul Odum, was indicted for first degree felony murder, first degree premeditated murder, conspiracy to commit aggravated burglary, aggravated burglary, burglary, theft of property valued at more than $1000,  and possession of a firearm by a convicted felon.  Prior to trial, the State filed a notice of intent to seek the death penalty and dismissed the first degree premeditated murder charge.  At the close of the State's proof, the trial court granted a motion for judgment of acquittal with respect to the burglary charge.  The jury ultimately found Defendant guilty of felony murder, conspiracy to commit aggravated burglary, aggravated burglary, theft of property valued at more than $1000, and possession of a firearm by a convicted felon.  Following the penalty phase, the jury sentenced Defendant to life without the possibility of parole.  The trial judge separately sentenced Defendant to an effective sentence of five years for the remaining convictions, to be served consecutively to Defendant's life sentence. Defendant appeals, arguing that (1) the trial court erred by denying the motion to disqualify the District Attorney's Office prior to trial; (2) the trial court erred by denying the motion to suppress Defendant's statement; (3) the evidence was insufficient to support the convictions; and (4) the sentence was excessive.  For the following reasons, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Richard Hughes, District Public Defender; Donald Leon Shahan, Jr. (at trial and on appeal), and Bryan Hoss (at trial), Assistant District Public Defenders, for the appellant, Thomas Paul Odum.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Stephen Crump, District Attorney General; and Heather Higginbotham, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural History*

On July 4, 2014, Tyler Womack, the victim, walked from the home he shared with his grandmother, Vicky Lee Womack, to a home across the street to borrow an air compressor from his neighbor, Art Ingram. When the victim did not return promptly and failed to respond to several text messages from Ms. Womack, she walked over to the Ingram property to look for her grandson. She found the victim lying dead on the ground next to an old car with a bag over his head. He had been shot once through the eye.

Eventually, Defendant, Amanda Britnell, and Martha Thompson were developed as suspects and were ultimately arrested. In August of 2014, all three defendants were indicted by the McMinn County Grand Jury for conspiracy to commit aggravated burglary, aggravated burglary, burglary, theft of property valued over $1000, first degree felony murder, and first degree murder. Defendant was also indicted for one count of possession of a firearm by a convicted felon.

In November of 2014, the State filed a notice of intent to seek the death penalty against Defendant, citing the following aggravating circumstances: (1) Defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of Defendant or another; and (3) the murder was knowingly committed, solicited, directed, or aided by Defendant, while Defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.[1] Prior to trial, the trial court dismissed the first degree premeditated murder charge upon motion by the State.

Joseph Hoffer was appointed by the McMinn County General Sessions Court to represent Codefendant Britnell. In March of 2015, after Codefendant Britnell's preliminary hearing, but prior to Defendant's trial, Mr. Hoffer was hired by the Tenth

---

[1] The State apparently also sought the death penalty against Codefendant Britnell.

Judicial District Attorney's Office. Codefendant Britnell received new counsel when Mr. Hoffer took this position. The District Attorney's Office implemented strict screening measures in April of 2015 to prevent Mr. Hoffer from having any interaction with Defendant's case. In April of 2015, Defendant filed a motion to disqualify the District Attorney's Office on the basis of Mr. Hoffer's involvement in the case.

The trial court held a hearing on the matter. At the conclusion of the hearing, the trial court denied the motion, finding that even though an actual conflict of interest existed, there was no damage or irreparable injury. Specifically, the trial court determined that the District Attorney's Office implemented adequate screening procedures and safeguards prior to Mr. Hoffer joining the office. The trial court also determined that the evidence established that Mr. Hoffer did not share any confidences that he was privy to as a result of his limited representation of Codefendant Britnell. In other words, the trial court determined that the State met its burden by clear and convincing evidence. The trial court entered a written order denying the motion. Defendant filed a motion in the trial court seeking permission for an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9. The trial court denied the motion. Defendant then filed a motion for reconsideration of his previous motion to disqualify the District Attorney's Office, and the trial court again denied the motion. Defendant filed an application for permission to appeal to this Court pursuant to Tennessee Rule of Appellate Procedure 10. This Court denied the application for permission to appeal on the basis that there was no proof that the trial court "so far departed from the accepted and usual course of judicial proceedings as to require immediate review." *State v. Thomas Paul Odum*, No. E2016-00342-CCA-R10-CD (order Feb. 26, 2016) (quoting Tenn. R. App. P. 10(a)). The Tennessee Supreme Court subsequently denied the application for permission to appeal. *See State v. Thomas Paul Odum*, No. E2016-00342-SC-R10-CD (order Apr. 11, 2016).

In November of 2015, Defendant filed a motion to suppress his statement. In the motion, Defendant complained that "through coercion, law enforcement agents continued to question him" after he asked for a lawyer in violation of his 5th and 14th Amendment rights. After a hearing, the trial court determined that Defendant was in custody but voluntarily chose to answer questions after being advised of his rights. Specifically, the trial court found that Defendant asked for a lawyer and the interviewers immediately stopped questioning Defendant. Shortly thereafter, Defendant reinitiated the interview by engaging the interviewers in conversation about the crime. Defendant was again advised about his rights before giving a statement. The trial court denied the motion to suppress.

*Trial Testimony*

When the victim was eight years of age, he moved in with his grandmother, Ms. Womack, in rural Athens, Tennessee. Mr. Ingram lived across the street from the

Womacks and often invited the victim to spend time at his home. Mr. Ingram's property and home were filled with old cars, guns, hunting equipment, a camper, and various other items.

Mr. Ingram knew Defendant. Shortly before the victim's death, Mr. Ingram had agreed to allow Defendant to perform 50 hours of work on a Nissan 300ZX in exchange for a 1972 GMC pickup truck. Defendant came by the Ingram property to discuss his work schedule on June 30 and worked approximately five hours that day. Mr. Ingram informed Defendant that he would be out of town for the remainder of the week visiting his girlfriend in Ringold, Georgia, and that Defendant could return the following Monday to work on the vehicle. Mr. Ingram did not give Defendant permission to work on the vehicle or be present at the house while he was out of town.

Before he left that day, Defendant told Mr. Ingram that he wanted to swap a bicycle for two antique Owlhead pistols described as "wall-hangers" owned by Mr. Ingram. Mr. Ingram went inside the house. Defendant followed him inside without being invited. Though they did not make the exchange that day, they discussed a potential swap.

On Friday, July 4, Ms. Womack asked the victim to take her car across the street to Mr. Ingram's home to borrow an air compressor to put air in one of her tires. She was aware that Mr. Ingram was out of town, so she sent him a text message asking his permission to use the air compressor. Mr. Ingram gave the victim permission to enter his property, and the victim walked over to Mr. Ingram's around 12:40 p.m.

Ms. Womack became concerned when the victim did not return in a prompt manner. At first, she thought that maybe Mr. Ingram was home and the victim had engaged him in conversation. Ms. Womack looked outside to see if she could see the victim coming back toward the house. She heard a "bang." Ms. Womack sent a text message to the victim asking him "what was that bang?" Because it was the Fourth of July, Ms. Womack assumed that she had heard fireworks. When the victim did not respond, she sent several additional text messages to him. The victim still did not respond. Ms. Womack walked outside and yelled for the victim. She eventually walked across the street to Mr. Ingram's property to search for her grandson. She found him lying on the ground next to an old car. There was a bag over his head. He had been shot one time in the head. Ms. Womack, hysterical, called 911 to report the shooting.

Around that same time, Margaret Mashburn, Ms. Womack's next door neighbor, was sitting on the front porch of her house talking to her daughter. Ms. Mashburn saw a person walk in front of the Ingram house and then "look[] up behind it like she was seeing maybe if a car or somebody was coming down the driveway." She then saw the

person walk down the driveway and continue down the road. Ms. Mashburn thought that the person walking in Mr. Ingram's front yard "looked like a girl."

Deputy Timothy J. Davis, Jr., of the McMinn County Sheriff's Office was the first officer to respond to the 911 call. He was dispatched to Mr. Ingram's home on a report of a "possible suicide." He encountered Ms. Womack, "running out into the yard towards the road, pointing [the officers] towards the back of the home." She was "hysterical," "really manic," and had blood on her hands from trying to administer first aid to the victim. Deputy Davis found the victim "against a car, slumped over." Deputy Davis described the victim as having an "impact site from a firearm to his right eye" and there being "quite a bit of blood." There was a "bag partially over the head" of the victim and an impact site on the vehicle.

According to the Medical Examiner, Dr. Christopher Lochmuller, the victim died as a result of a single gunshot to the right eye. The entrance wound contained "searing," which indicated that the muzzle of the gun was held either very close to the skin or was in contact with the skin at the point of impact. Dr. Lochmuller opined that the victim's head was covered by the nylon bag and that the muzzle of the gun was touching the bag at the time the victim was shot.

Sergeant Joseph Paul Johnson arrived on the scene shortly after Deputy Davis. The officers worked together to secure the scene, taking note that Mr. Ingram, the property owner, was not home. Officers saw a still for making moonshine, several bottles of morphine and lidocaine, needles, and other drug paraphernalia around the home as well as several firearms inside the home. It appeared that one of the outbuildings and a camper located at the residence had been forcibly entered. Detective Blake Witt of the McMinn County Sheriff's Office was one of the officers on the scene that day. As part of the crime scene investigation, he recovered a cigarette butt from the driveway. DNA on the cigarette butt found in the driveway matched the Defendant's DNA. Three other cigarette butts located in the driveway, on the kitchen table, and on the back porch matched the DNA of Codefendant Thompson.

Several days after the victim's death, Detective Witt met with Mr. Ingram. During the interview, Mr. Ingram explained that he hired Defendant to work at his property prior to the victim's death. He also identified many items that were missing from his property after the victim's death, including guns, scopes, ammunition, bottles of wine, camcorders, DVD players, knives, arrows, crossbows, and swords as well as other items. The interview with Mr. Ingram led to Defendant being developed as a suspect.[2]

---

[2] On cross-examination, Mr. Ingram admitted that prior to his meeting with law enforcement, he was given an immunity letter in which the District Attorney's Office agreed not to prosecute him for matters unrelated to the homicide of the victim.

The sheriff's office began to receive reports from people who located some of the missing items. Police eventually executed a search of the residence of Maggie Britnell, the mother of Codefendant Britnell. At the residence, officers found a number of Mr. Ingram's missing items. Defendant arrived at the Britnell home while the officers were executing the search and was taken into custody.

At the time of his arrest, Defendant was in possession of a six-shot Ruger Superhawk .44 Magnum pistol with five rounds in the cylinder and one round missing. At the police station, Defendant initially signed a waiver of rights form and agreed to speak with officers. When Defendant learned he was being accused of murder, he asked for an attorney. The officers immediately ceased the interview. Within seconds, Defendant started to speak. Officers interviewed Defendant and the interview was reduced to a written statement as follows:

> On a day that I remember to be around the first part of July 2014, I asked Martha LNU[3] and Amanda LNU if they wanted to do a burglary with me. They had been wanting to do a burglary.
>
> I told them that I was going to burglarize Art LNU's house because I had worked for Art in the past and knew what he had there to steal. I knew this because I had some work done over at Art's before changing dashes on cars. Martha and Amanda wanted to go with me to burglarize Art's home and asked for guns to take with them. I gave Amanda a [.]44 caliber revolver and I gave Martha a [.]38 caliber revolver. The [.]44 caliber revolver that was used in this burglary by Amanda was with me in the truck when I was approached by law enforcement tonight.
>
> We then loaded up in my truck which is a Ford Ranger red in color. I drove the truck and we went over to Art's. We didn't know whether Art would be there or not. If Art was there I was going to just buy a quart of moonshine from him. If Art wasn't there we were going to burglarize the place. We were going to try to steal the liquor and anything of value. When we got there Art wasn't home. I went to try to get into the house and couldn't get the door open. I went back to my truck to get a crowbar but when I got back to the house the girls had already got the door open. One of the girls opened the door to the camper as well.
>
> During the burglary the following items were stolen by the three of us: guns (single shot shotguns, pistols (homemade pistols that had been cut down in

---

[3] We understand "LNU" to stand for "Last Name Unknown."

[.]38 or [.]357 caliber/there was six to eight of these)[)], a couple of [.]38 caliber revolvers, liquor, moonshine, wine, batteries, scopes, pill bottles, crossbows (Two of these), swords (at least two of these which were in cases/one was like a pirate sword), and tazers.

The three of us gathered the above listed items and Martha began loading the stuff in the back of my pickup truck. While I was gathering more things in the house I heard the girls yelling outside. I eventually came out of the house and saw that Amanda had something over a guy[']s head that had driven up during the burglary. She was standing in front of him with the pistol. She had him sitting down up against a vehicle with something over his head. Martha had run off and because she had, Amanda was raising hell. I told Amanda to come on and get in the truck before I left her. I got in the truck to start it and heard a shot. I looked at Amanda and she had shot the boy and then came over and got in my truck. When I backed up I saw that the boy was still laying up against the side of the vehicle where he had been shot. Amanda and I picked up Martha on our way out on the side of the road. Amanda was raising hell with Martha for leaving. I have no idea who the boy was that Amanda shot. Amanda didn't say that she knew who the boy was either.

When we got back to the house where I saw law enforcement tonight, we unloaded the truck and split the stuff up. Most of the stuff I kept is in the bedroom of this house and is as follows: a plastic basket/tote and it[]s contents, a set of cufflinks and a crossbow. The majority of the stuff we stole, I traded to Ricky LNU in Athens, TN for a pick-up truck that is in the yard of Maggie's house. I told Ricky that the stuff I was trading him was stolen and that a boy was shot during the burglary. I told Ricky that the stuff had blood on it (not in the literal sense). I have provided directions to this house. These items were traded to Ricky three to four days ago.

I have dated Maggie LNU for a little less than a month. I stay at Maggie's house off and on some but that is not where I live. I live at . . . Athens, TN.

It was my idea to burglarize Art's place but if I had known that crazy bitch Amanda was going to shoot that boy I never would have gone.

The murder weapon (.44 caliber revolver) is in the truck I drove into the driveway. There is another shotgun behind the seat. I had cleaned the .44 caliber revolver after the murder so that I could try to sell it.

At the conclusion of the State's proof, Defendant sought a motion for judgment of acquittal with regard to the burglary charge. The trial court granted the motion.

Defendant called Eric and David Dustin of Dustin Forensics to testify on his behalf. Dustin Forensics utilizes a 3-D laser scanning device to reconstruct crime and accident scenes. When Dustin Forensics recreated the crime scene, they discovered that the initial measurement taken by law enforcement that the bullet mark on the vehicle was thirty-six inches off the ground was inaccurate. According to David Dustin, the bullet struck the vehicle twenty-eight inches off the ground, rendering all law enforcement measurements with regard to trajectory inaccurate. Kelly Fite, an expert in ballistics, crime scene reconstruction, and bullet trajectory also agreed that the measurement of the bullet's trajectory was off by eight inches. This indicated that the actual firearm was held at a height of twenty-three to twenty-eight inches at the time it was fired. None of the witnesses for Defendant were able to offer an opinion as to who killed the victim.

At the conclusion of the evidence, the jury found Defendant guilty of first degree felony murder, conspiracy to commit aggravated burglary, aggravated burglary, theft of property valued over $1000, and possession of a firearm by a convicted felon.

*Penalty Phase*

During the penalty phase, the jury learned that Defendant was one of fourteen children. Defendant spent his childhood moving from place to place, often for his father to find work as an upholsterer. The family lived in Ohio, Georgia, and Tennessee, and the children, including Defendant, changed schools frequently. Defendant dropped out of school when he was sixteen or seventeen, and he became interested in working on cars.

Defendant had several prior convictions, including a robbery conviction and two convictions for aggravated assault in Georgia, for which he received an effective sentence of forty years. As part of the presentence report prepared in Georgia, Defendant gave a statement explaining the facts which gave rise to those convictions. According to Defendant, he and his cousin committed a burglary during which they took jewelry and rum. They got drunk on the rum and traded the stolen jewelry for crack cocaine before meeting a man referred to as "Kenneth." Defendant claimed he could not remember anything else because he was unconscious but claimed that "the guy" robbed Kenneth and ran over him twice with Defendant's car.

While incarcerated in Georgia, Defendant took part in several classes including 1234 hours of instruction in the Telfare Correctional Institute Diesel Mechanical Program. Defendant was paroled to Tennessee in 2013. When he was first transferred to Tennessee, Defendant reported for monthly parole meetings. In mid-2014, Defendant stopped reporting.

At the conclusion of the penalty phase, the jury sentenced Defendant to life without the possibility of parole. Shortly thereafter and prior to being sentenced for the remaining convictions, Defendant filed a premature motion for new trial. The trial court eventually sentenced Defendant to an effective sentence of five years to be served consecutively to Defendant's life sentence. The trial court denied the motion for new trial and this timely appeal followed. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof.").

*Analysis*

*I. Denial of Motion to Disqualify District Attorney's Office*

Defendant argues on appeal that the trial court erred by denying a motion to disqualify the District Attorney's Office based on a "material conflict of interest" involving an assistant district attorney. Specifically, Defendant argues that because an assistant district attorney represented Codefendant Britnell prior to accepting a position at the District Attorney's Office, an obvious conflict of interest was present. Relying on *Clinard v. Blackwood*, 46 S.W.3d 177 (Tenn. 2001), Defendant insists that the trial court should have disqualified the entire District Attorney's Office. The State, on the other hand, argues that the trial court did not abuse its discretion in determining that the District Attorney's Office screened the assistant district attorney from the case.

As mentioned above, Defendant filed a motion to disqualify the District Attorney's Office prior to trial on the basis that Assistant District Attorney Joseph Hoffer represented Codefendant Britnell at the preliminary hearing phase while he was in private practice and subsequently took a position with the District Attorney's Office. At the hearing on the motion, Mr. Hoffer testified that he was hired by the District Attorney's Office in March of 2015. He explained that prior to accepting the position as an assistant district attorney, he maintained a private law practice for ten years. Prior to that time, he worked as a prosecutor and served in the United States Attorney's Office in Puerto Rico for two years. With the exception of two years, Mr. Hoffer had spent his entire legal career in criminal law.

Mr. Hoffer explained that he was appointed to represent Codefendant Britnell by the McMinn County General Sessions Court and represented her prior to and during the preliminary hearing as well as a brief time following the preliminary hearing. He interviewed her in jail a number of times and began investigating the case by reviewing witness statements and police reports. Mr. Hoffer also entered into initial discussions with the prosecutor handling the case, Heather Higginbotham. In December 2014, after the indictment had been issued and the State had filed the notice of intent to seek the

death penalty against Codefendant Britnell, Mr. Hoffer was removed from the case because he was not "death qualified." At the same time, he was in discussions with the District Attorney's Office regarding employment, but the possibility did not become "more definite" until sometime in early 2015. Eventually, he accepted the position as the supervisor of the McMinn County and Monroe County offices.

In preparation for taking the position with the District Attorney's Office, Mr. Hoffer identified the conflict, moved to withdraw from representation of Codefendant Britnell (prior to his removal by the trial court because he was not death qualified), and disclosed the matter to the other attorneys in the office—District Attorney Stephen Crump, Deputy District Attorney Cindy Schemel, and Assistant District Attorney Heather Higginbotham. In fact, Mr. Hoffer testified that he entered into an oral agreement with the office that he would not discuss the case with them and that they would refrain from any discussion of the case with him. Mr. Hoffer actually identified a total of three cases in which he had a conflict.

Mr. Hoffer, as supervisor, was in charge of the attorneys assigned to prosecute Defendant's case. In fact, Assistant District Attorney Higginbotham's office was next door to Mr. Hoffer's office. Mr. Hoffer explained that the Tenth Judicial District Attorney's Office maintained offices in multiple locations, including an office in Cleveland, where cases out of Polk and Bradley Counties were handled, and an office in Athens, where cases out of McMinn and Monroe Counties were handled.

Assistant District Attorney Higginbotham testified that she was aware of Mr. Hoffer's involvement in the case prior to the time he became employed at the District Attorney's Office. As a result, she was instructed to screen Mr. Hoffer from the case and limited those she spoke to about the case to District Attorney Crump and Deputy District Attorney Schemel. The case file was moved from the Athens office to the Cleveland office, and any meetings about the case took place at either the Cleveland office or at the McMinn County Sheriff's Department to avoid any potential conflict.

Deputy District Attorney Schemel confirmed that Mr. Hoffer was screened from the case and that the entire office was instructed that no one was to discuss the case in the Athens office. Despite the absence of a written policy, Deputy District Attorney Schemel was insistent that steps were taken to insure that Mr. Hoffer had no involvement in the case.

At the conclusion of the hearing, the trial court made lengthy findings, accrediting the testimony of "all witnesses." The trial court acknowledged that Mr. Hoffer had an actual conflict of interest. Then, the trial court looked to see whether there were "adequate screening procedures in place." The trial court determined that moving the case file to Cleveland was "an additional step above and beyond what would be

required," specifically that the screening procedures were effective to prevent the flow of information about the matter between the disqualified lawyer and other lawyers. Additionally, the trial court determined that nothing was "disclosed, no confidence has been shared," and the screening measures were "more than adequate." In a written order, the trial court determined that "no confidences have been shared and the risk of harm of future disclosure and questions concerning public confidence in the ultimate adjudication are rendered moot by the screening procedures in place." The trial court found that Mr. Hoffer's "conflict should not be impugned to others in the District Attorney's Office and disqualification of the entire District Attorney's Office is not required, nor warranted." As a result, the trial court denied the motion. Now, on appeal, Defendant complains that the trial court erred.

Initially, we note that improper or unethical participation by a prosecutor or a prosecutor's office in a criminal case may implicate the basic constitutional rights of a defendant, "the orderly administration of justice, the dignity of the courts, the honor and trustworthiness of the legal profession[,] and the interests of the public at large. . . ." *State v. Phillips*, 672 S.W.2d 427, 435 (Tenn. Crim. App. 1984); *see also State v. Coulter*, 67 S.W.3d 3, 28-29 (Tenn. Crim. App. 2001). In protecting these concerns, Tennessee courts generally turn for guidance to our Code of Professional Responsibility, as adopted by our supreme court in Tennessee Supreme Court Rule 8, and to court-created principles of professional conduct. *Coulter*, 67 S.W.3d at 28. A trial court's ruling on the matter is subject to an abuse of discretion standard review. *Clinard*, 46 S.W.3d at 182. A trial court abuses its discretion whenever "'it appl[ies] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that causes an injustice to the party complaining." *Id.* (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Both the State and Defendant agree that Mr. Hoffer's representation of Codefendant Britnell at the preliminary hearing stage followed by employment with the District Attorney's Office during the pendency of Defendant's case created an actual conflict of interest. Defendant insists that this Court should utilize the factors set forth in *Clinard*[4] to determine whether the entire office should be disqualified. However, *Clinard*

---

[4] The following non-exclusive list of factors were provided in *Clinard* to determine "whether the screening mechanisms reduce to an acceptable level the potential for prejudicial misuse of client confidences" such that the presumption of shared confidences is rebutted:

1) the structural organization of the law firm or office involved,

2) the likelihood of contact between the "infected" person and the specific attorneys and support personnel involved in the present representation,

3) the existence of law firm or office rules which prevent the "infected" person

is more applicable to civil cases, providing a "framework for determining whether an attorney's prior involvement in a case mandates disqualification of the attorney's new law firm in a subsequent representation." *State v. Davis*, 141 S.W.3d 600, 613 (Tenn. 2004), *overruled on other grounds by State v. Jackson*, 173 S.W.3d 401, 407 (Tenn. 2005)).   This Court has taken a different approach to examining the need for disqualification of an entire office in the context of a criminal proceeding primarily because there is a "'distinction between lawyers in government service and those in private practice'" as well as a "'difference between criminal proceedings and civil proceedings.'" *Coulter*, 67 S.W.3d at 32 (quoting *Clinard*, 46 S.W.3d at 188).  Indeed,

> [p]rivate and public practice have significant distinctions, such that screening procedures for attorneys in government service are generally viewed with less skepticism: "The relationships among lawyers within a government agency are different from those among partners and associates of a law firm.   The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice."

*State v. Ricky Raymond Bryan*, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890, at *6 (Tenn. Crim. App. Aug. 4, 2000) (quoting *United States v. Caggiano*, 660 F.2d 184, 191 (6th Cir.1981)), *perm. app. denied* (Tenn. Dec. 11, 2000);

When considering disqualification in a criminal case, "[t]he trial court's determination requires an inquiry into whether the prosecutor who has the conflict of interest has participated in the ongoing prosecution, including the disclosure of any confidences, and whether the prosecution has established that the prosecutor has been screened from the prosecution." *Davis*, 141 S.W.3d at 613 (citing *Coulter*, 67 S.W.3d at 30).  A prosecutor's disqualification need not be imputed to the "entire district attorney general's office . . . so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution." *State v. Tate*, 925 S.W.2d 548, 556 (Tenn. Crim. App. 1995) (citing *Mattress v. State*, 564 S.W.2d 678, 680 (Tenn. Crim. App. 1977)).   This principle has been followed even when a member of the defendant's defense team joins the district attorney's office while the defendant's case is still pending. *See State v. Steve Mason*, No. 01C01-9603-CC-00103, 1997 WL 311900 (Tenn. Crim. App. June 6, 1997), *perm. app. denied* (Tenn. Feb. 23, 1998).

---

a) from access to relevant files or other information pertaining to the present litigation and

b) from sharing in the fees derived from such litigation.

46 S.W.3d at 184.

The implementation of screening procedures usually resolves the problems pertaining to actual conflicts or the appearance of impropriety. *See Tate*, 925 S.W.2d at 556. In the case herein, Mr. Hoffer had no contact with any aspect of Defendant's case and did not in any way participate in the prosecution of this case once he accepted the position at the District Attorney's Office. *See Phillips*, 672 S.W.2d at 435. In other words, this is not a scenario in which Mr. Hoffer "switched teams in the middle of the game after learning the signals." *Clinard*, 46 S.W.3d at 187. Prior to joining the District Attorney's Office, Mr. Hoffer took steps to ensure that he was screened from Defendant's case. Even though there was no written screening policy, Assistant District Attorney Higginbotham limited those with whom she discussed Defendant's case to District Attorney Crump and Deputy District Attorney Schemel. The case file was moved to the Cleveland office, and any communication taking place in the Athens office was done via email and/or with the intent of screening Mr. Hoffer from the case. Mr. Hoffer testified that he did not share confidences he learned as part of his representation of Codefendant Britnell during the preliminary hearing stage. The trial court accredited the testimony of Mr. Hoffer and the rest of the witnesses from the District Attorney's Office and determined that the screening procedures put in place were more than adequate given the circumstances. Based on the facts presented here, we cannot conclude that Mr. Hoffer's presence in the District Attorney's Office during the pendency of Defendant's trial warranted disqualification of the entire office. The trial court did not abuse its discretion in denying Defendant's motion. Defendant is not entitled to relief on this issue.

## II. Denial of Motion to Suppress

Defendant insists that the trial court improperly denied the motion to suppress his statement to police. Specifically, Defendant argues that he unequivocally asserted his constitutional rights by telling the officers conducting his interrogation that he did not have anything to say and wanted a lawyer. According to Defendant, any further questioning by law enforcement violated Defendant's rights. The State, on the other hand, argues that the trial court properly denied the motion because the evidence at the suppression hearing demonstrated that Defendant himself initiated the contact with law enforcement after he initially signed his *Miranda* waiver.

At the suppression hearing, Special Agent Joshua Melton of the Tennessee Bureau of Investigation ("TBI") testified that he was contacted by the District Attorney's Office to assist in the investigation of this case. He was present on July 16, 2014, when Defendant was taken into custody by the McMinn County Sheriff's Office at approximately 1:40 a.m. Agent Melton and Investigator Calvin Rockholt of the District Attorney's Office spoke with Defendant in the conference room at the sheriff's office. Agent Melton could not recall if Defendant was restrained. Agent Melton and Investigator Rockholt recited and "went through the admonition and waiver." Then, they asked Defendant if he understood and if he was willing to speak. Defendant initially

indicated that he was willing to talk and signed the admonition. After Defendant signed the form, Agent Melton informed Defendant that they were involved in the investigation of the death of the victim. Defendant asked if he was being accused of murder. As soon as Agent Melton confirmed that Defendant was being accused of murder, Defendant stated, "Well, I don't have anything else to say and I want an attorney." Agent Melton said, "Okay, then we're done." According to Agent Melton, as soon as he informed Defendant that they were done, Defendant commented, "I want you to know, I didn't kill that boy. Amanda [Britnell] did. I was at the burglary, but I didn't kill that boy. I'll talk to you." Agent Melton stopped Defendant and explained that he was giving mixed signals by first agreeing to talk, then requesting an attorney, then continuing to talk. Defendant "reiterated again that he wanted to talk." Agent Melton again explained to Defendant that he had an "absolute" right to refuse to provide a statement and an "absolute" right to an attorney. Defendant continued to maintain that he wanted to talk to the officers.

Agent Melton testified that Defendant was interviewed and the responses were reduced to a statement. Agent Melton read the statement aloud to Defendant and offered him the opportunity to make additions and/or corrections to the statement. Defendant added a sentence to the statement before Agent Melton reread the statement to Defendant. The statement was signed by Defendant and both officers. Defendant did not appear to be under the influence of drugs or alcohol at the time of the interview. Agent Melton stated that the interview was not recorded either by audio or video equipment.

Investigator Rockholt confirmed Agent Melton's version of events. Specifically, Investigator Rockholt recalled that the interview ceased as soon as Defendant requested an attorney. Before he or Agent Melton could say anything else, Defendant exclaimed, "I didn't kill that boy. I did the burglary, but Amanda [Britnell] shot that boy." Investigator Rockholt remembered throwing up his hands and telling Defendant to stop because he had requested an attorney. Defendant insisted on talking. Eventually, the interview was reduced to writing while Defendant ate pancakes. Defendant signed the statement.

The trial court accredited the testimony of both Agent Melton and Investigator Rockholt. The trial court determined that Defendant was in custody but voluntarily chose to relinquish his rights by choosing to answer questions after being advised of his rights. The trial court noted that after Defendant's initial request for an attorney, the interview ceased. Defendant reinitiated the interview by continuing to talk to investigators without any action of the officers. The trial court determined that the statement was given "knowingly, freely, and voluntarily." As a result, the motion to suppress was denied.

In reviewing a trial court's ruling on a motion to suppress, this Court will uphold the trial court's findings of fact "unless the evidence preponderates otherwise." *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014) (citing *State v. Climer*, 400 S.W.3d 537, 556

(Tenn. 2013)).  Witness credibility, the weight and value of the proof, and the resolution of conflicts in the proof "are matters entrusted to the trial court as the trier of fact."  *Id*. at 529.  "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)).  The trial court's resolution of questions of law and application of the law to the facts are reviewed de novo with no presumption of correctness.  *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008).  On appeal, the losing party bears the burden of demonstrating that a trial court's decision concerning a motion to suppress was erroneous.  *State v. Harts*, 7 S.W.3d 78, 84 (Tenn. Crim. App. 1999).  "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial."  *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the state and federal constitutions guarantee an accused the right to the assistance of counsel and the right against self-incrimination.  The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."  The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment.  *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).  The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  *See Gideon v. Wainwright*, 372 U.S. 335, 342 (1963) (holding that Sixth Amendment right to counsel in criminal proceedings applies to states through Fourteenth Amendment).  Similarly, article I, section 9 of the Tennessee Constitution provides: "That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel."  Tennessee courts have consistently interpreted the right to counsel under article I, section 9 of the Tennessee Constitution as identical to the Sixth Amendment right to counsel.  *See State v. Willis*, 496 S.W.3d 653, 702-03 (Tenn. 2016), *cert. denied*, 137 S. Ct. 1224 (2017).

Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights.  *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994).  A defendant's rights to counsel and to remain silent may be waived as long as the waiver is made voluntarily, knowingly, and intelligently.  *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992).  However, during the course of an interrogation, if the defendant clearly and unequivocally invokes either his right to

silence or his right to counsel, the interrogation must immediately cease. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994). "The fundamental purpose of the Court's decision in *Miranda* was 'to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.'" *Connecticut v. Barrett*, 479 U.S. 523, 528 (1987) (emphasis omitted) (quoting *Miranda*, 384 U.S. at 469).

In this case, Defendant claims that he unequivocally invoked both his right to silence and his right to counsel and that the interview was continued "contrary to law." Once a suspect unequivocally invokes his right against self-incrimination, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda*, 384 U.S. at 474, 479). Similarly, once a suspect invokes his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). In *Edwards*, the United States Supreme Court essentially established a "second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him.'" *McNeil v. Wisconsin*, 501 U.S. 171, 176-77 (1991) (quoting *Edwards*, 451 U.S. at 484-85). However, "[t]he U.S. Supreme Court has clearly sanctioned the admissibility of a statement given after the appointment of counsel and even after defendant has 'expressed his desire to deal with police only through counsel,' where defendant initiates further communication, electing 'to face the state's officers and go it alone,' and knowingly and intelligently waives his Sixth Amendment right to counsel." *State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989) (citing *Patterson v. Illinois*, 487 U.S. 285 (1988); *Edwards v. Arizona*, 451 U.S. 477 (1981)).

The voluntariness of a confession "remains distinct from *Miranda*." *Climer*, 400 S.W.3d at 567 (citing *Dickerson*, 530 U.S. at 434-35). Because "coerced confessions are inherently unreliable," only voluntary confessions may be admitted as evidence. *Id*. (citing *Dickerson*, 530 U.S. at 433). It has long been held that for a statement to be voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith*, 933 S.W.2d at 455. Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id*. (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)); *see also State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) (holding "for

a confession to be involuntary, it must be the product of coercive state action"). In order to determine the voluntariness of a statement, a court must "examine the totality of the circumstances surrounding the giving of a confession, 'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434); *see also Monts v. State*, 400 S.W.2d 722, 733 (Tenn. 1966). Factors relevant to this determination include:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)); *see State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (recognizing that no single factor is necessarily determinative).

The trial court determined that Defendant was in custody but voluntarily chose to answer questions, thereby relinquishing his rights. It is undisputed that Defendant initially waived his *Miranda* rights but then chose not to answer further questions and requested an attorney when he was told that he was a suspect in a murder investigation. Defendant insists that he never agreed to continue to speak with Agent Melton and Investigator Rockholt after he asked for an attorney. However, Defendant does not point to any evidence adduced at trial or at the suppression hearing to support his claim. *See* Tenn. Ct. Crim. App. R 10(b) ("Issues which are not supported by . . . appropriate references to the record will be treated as waived in this Court."); Tenn. R. App. P. 27(a)(7)(A) (A brief shall contain "[a]n argument . . . with citations to the authorities and appropriate references to the record . . . relied on."). In fact, all of the evidence at the hearing and at trial indicated that the officers behaved exactly as they were supposed to given the circumstances. The moment that Defendant asked for an attorney, Agent Melton told Defendant they were "done." The interview stopped, thereby scrupulously honoring Defendant's invocation of his right to silence. *See Mosley*, 423 U.S. at 104. Before Agent Melton and Investigator Rockholt could leave the room, Defendant spontaneously continued the conversation, claiming that Codefendant Britnell was the actual killer. The trial court accredited the testimony of the State's witnesses that they stopped the interview and cautioned Defendant heavily when he started talking again. The evidence does not preponderate against the judgment of the trial court. Defendant

reinitiated communication with law enforcement after invoking his right to an attorney. *See Edwards*, 451 U.S. at 484-85. The interviewers did not engage in any coercive activity that would have elicited his incriminating statement. The motion to suppress was properly denied. Defendant is not entitled to relief on this issue.

## III. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to sustain his conviction for first degree felony murder. Specifically, he argues that there was not proof at trial pointing to his participation in the shooting death of the victim. The State insists that the evidence is sufficient because the victim's death took place during the perpetration of an aggravated burglary and theft by Defendant and, therefore, the evidence is sufficient to support the convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of first degree felony murder, "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary [or] theft." T.C.A. § 39-13-202(a)(2). Aggravated burglary takes place where a person enters a habitation not open to the public with the intent to commit a theft. T.C.A. § 39-14-402, -404. Theft of property is committed when, with the intent to deprive the owner of

property, a person knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103.

Defendant argues, quite conventionally, that the evidence is insufficient because "there was no proof presented in evidence that indicates [Defendant] was the one who committed the actual homicide, shooting the victim." The evidence, in a light most favorable to the State, demonstrates that Defendant asked Codefendants Britnell and Thompson to participate in a burglary. Mr. Ingram confirmed that he knew Defendant and hired him to perform some work on a vehicle on his property. In fact, Mr. Ingram acknowledged that Defendant had been inside his house and knew that he had guns and other items at the house that were ultimately stolen in the burglary. Defendant knew that Mr. Ingram was out of town and took Codefendants Britnell and Thompson to Mr. Ingram's home armed with a .44 revolver that he would later identify as the murder weapon. Defendant admitted that he stole items from Mr. Ingram's house. When he exited the house, he saw Codefendant Britnell holding the victim at gunpoint. Defendant also saw Codefendant Britnell arguing with Codefendant Thompson. Defendant claimed that Codefendant Britnell fired the fatal shot as he called for her to leave the property with him in his truck. A cigarette butt with Defendant's DNA was found at the scene. When he was arrested, Defendant was in possession of the murder weapon. Defendant was not required to actually pull the trigger of the gun that killed the victim in order to be convicted because felony murder does not require participation in the killing or an intent to kill. *See* T.C.A. § 39-13-202(a)(2), -(b) ("No culpable mental state is required for a conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in those subdivisions."). The evidence was sufficient to support the conviction. Defendant is not entitled to relief on this issue.

*IV. Sentencing*

Defendant challenges the application of one of the aggravating factors found by the jury and used to fashion his sentence of life without parole. Specifically, Defendant argues that the evidence did not show "that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant, or another." *See* T.C.A. § 39-13-204(i)(6). Stated differently, Defendant claims that the "murder was not committed, planned, or even reasonably foreseeable by [Defendant,] and thus he had no role in the murder's commission." The State notes that Defendant concedes the application of the other aggravating factor—prior conviction for a violent felony—and does not argue that the jury imposed the sentence arbitrarily. The State argues that the evidence supports the jury's finding of both aggravating factors.

Defendant bears the burden of establishing that his sentence is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Goodwin*, 143 S.W.3d 771, 783 (Tenn. 2004). When appealing a sentence of life imprisonment without the possibility of parole,

this Court first considers errors assigned by the defendant and then reviews the appropriateness of the sentence. T.C.A. § 39-13-207(g). "A sentence of imprisonment for life without possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." *Id.*; *see also State v. Harris*, 989 S.W.2d 307, 317 (Tenn. 1999).

Defendant concedes on appeal that the State proved beyond a reasonable doubt that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person." *See* T.C.A. § 39-13-204(i)(2). The State introduced proof of Defendant's previous convictions for robbery and two convictions for aggravated assault in Georgia. Defendant argues that the State failed to prove "that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant, or another" but offers no authority to support his position. Thus, Defendant has waived this issue. *See* Tenn. Ct. Crim. App. R 10(b) ("Issues which are not supported by . . . appropriate references to the record will be treated as waived in this Court."); Tenn. R. App. P. 27(a)(7)(A) (A brief shall contain "[a]n argument . . . with citations to the authorities and appropriate references to the record . . . relied on."). Moreover, Defendant does not allege that the jury imposed the sentence arbitrarily and concedes and the proof supports the application of the first aggravating factor, rendering Defendant's challenge to the application of the second aggravating factor moot and we need not tarry long. Defendant's own statement supports the application of this factor as Defendant told authorities that the victim interrupted the burglary of Mr. Ingram's home. Codefendant Britnell covered the victim's head with a bag and shot and killed him when Defendant asked her to leave. The evidence supported the application of this aggravating factor. Defendant has failed to demonstrate that the jury grossly abused the substantial discretion afforded jurors in determining which sentence to impose. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE